39 F.3d 1439
 63 USLW 2318, 7 A.D.D. 1, 5 NDLR P 458
 Jay Lee GATES, John Ronald Bertram, Plaintiffs-Appellees,
v.
James ROWLAND and his successor in office James H. Gomez,
Directorof the California Department of Correction; Nadim
Khoury, M.D., Assistant Deputy Director--CDC Health
Services; Eddie Ylst and his successor in office Steve
Cambra, Warden (Interim)--California Medical Facility;
Kenneth Shepard, M.D., Chief Deputy Warden for CMF Clinical
Services; Nicholas Poulos, M.D., and his successor in
office George R. Gay, Chief Physician and Surgeon (Acting);
CMF; Paul Morentz, M.D., Chief Psychiatrist--CMF Outpatient
Psychiatric Program; H. Benton, M.D., and his successor in
office A.R. Rotella, M.D., Chief Psychiatrists--Northern
Reception Center; D. Michael O'Connor, M.D., and his
successor in office William Mayer, Director of the
California Department of Mental Health; Douglas G.
Arnold and his successor in office Clyde Murrey, Acting
Deputy Director for State Hospitals; DMH and Sylvia Blount,
R.N., Executive Director--DMH Vacaville Psychiatric Program,
Defendants-Appellants.
Jay Lee GATES, Plaintiff-Appellant,
and
George Deukmejian, Governor, Plaintiff,
v.
James ROWLAND, Director, Defendant-Appellee.
Jay Lee GATES, et al., Plaintiffs-Appellees,
v.
George DEUKMEJIAN; Ron Shinn; James Rowland; Nadim
Khoury, M.D.; Assistant Deputy Director--CDC Health
Services; Eddie Ylst; Kenneth Shepard, Chief Deputy Warden
for CMF Clinical Services, et al., Defendants-Appellants.
 Nos. 91-16702, 91-16780, 93-15363 and 93-16136.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 8, 1994.
Decided Nov. 4, 1994.
 
 Allen R. Crown, Asst. Atty. Gen., Michael A. Santoki, Supervising Deputy Atty. Gen., and James E. Flynn, Deputy Atty. Gen., Sacramento, CA, for defendants-appellants-cross-appellees.
 Sanford Jay Rosen, Rosen, Bien & Asaro, and Matthew A. Coles, ACLU Foundation of Northern California, Inc., San Francisco, CA, and Donald Specter, Prison Law Office, San Quentin, CA, for plaintiffs-appellees-cross-appellants.
 Appeals from the United States District Court for the Eastern District of California.
 Before: HUG, FARRIS, and O'SCANNLAIN, Circuit Judges.
 HUG, Circuit Judge:
 
 
 1
 A consent decree entered into by various California state officials and a class, including all inmates at the California Medical Facility ("CMF") in Vacaville, California, gives rise to these three separate appeals and a cross-appeal. The inmates brought an action under 42 U.S.C. Sec. 1983 to challenge deficient medical and psychiatric care, indecent confinement conditions, and treatment and segregation of HIV-positive inmates at the CMF--Main and Northern Reception Center. The consent decree included a provision for payment of attorneys' fees.
 
 
 2
 In No. 93-15363, the defendants-appellants challenge the district court's interpretation of the consent decree, so far as defendants are required to provide additional correctional staff at CMF. In No. 93-16136, the defendants-appellants challenge the district court's order enjoining them from denying food service positions to HIV-positive inmates. In No. 91-16702, the defendants-appellants appeal the district court's award of attorneys' fees to the plaintiffs. In No. 91-16780, the plaintiffs cross-appeal contending that additional attorneys' fees are due.
 
 I.
 FACTS
 
 3
 Plaintiffs brought this action to challenge conditions at the CMF--Main and Northern Reception Center, which they alleged were overcrowded and understaffed. The certified class of all inmates at CMF claimed that the shortages of custody staff and overcrowding exposed them to an unconstitutional risk of harm in violation of the Eighth and Fourteenth Amendments. As a remedy, they proposed limits on the numbers of inmates who could be housed at CMF and an increase in the correctional staff to provide "adequate supervision" for inmates. They also alleged that the denial of access to medical and mental health care and to attorneys, and the segregation of HIV-positive inmates violated their constitutional rights. A subclass of HIV-positive inmates made claims under section 504 of the Rehabilitation Act of 1973, 29 U.S.C. Sec. 794. The section 504 claims of mobility-impaired inmates confined to wheelchairs and of mentally ill inmates were also included in the action.
 
 
 4
 After two months of trial, settlement negotiations began. The defendants agreed to an alternative dispute resolution procedure, which used a mediator with correctional experience who would assist with negotiations and, if necessary, would file findings and recommendations with the court.
 
 
 5
 A consent decree was approved on March 8, 1990. The consent decree stated that it was not intended "to prescribe the minimum standards required by the United States Constitution." The consent decree provided for a dispute resolution process, involving mediation and reports to the court. Under the procedure outlined in the consent decree, the mediator is to work with the parties to resolve disagreements through mediation, but also has the power to make findings and recommendations in a report to the court on those matters that are not resolved through mediation. The parties could object to the mediator's report and obtain a court determination of any issue.
 
 II.
 NO. 93-15363: CUSTODIAL STAFFING
 
 6
 The defendants agreed to review existing staffing levels and to report on whether they believed there were "adequate custody staff to properly supervise and to provide escorts and other services to inmates in those units." Pursuant to the decree, the defendants submitted a report reviewing the custody staffing level at CMF and concluding that the level was adequate. The plaintiffs disputed the report's conclusions, and a mediator retained a consultant, James Henderson, a correctional staffing expert, to prepare a report that was provided on June 26, 1991. Henderson conducted a staffing analysis to determine the minimum number of correctional officers required to operate the prison safely, and concluded that custodial staffing at CMF should be increased by 36 positions.
 
 
 7
 The defendants objected to Henderson's report. The mediator was unable to resolve the disagreement over the adequacy of custodial staffing, thus, a formal evidentiary hearing was held on October 8, and November 1, 1991, as provided by the consent decree.
 
 
 8
 The mediator found that the Henderson report was a "conservative but sound staffing analysis." He deleted all positions in Henderson's recommendation that were added to improve efficiency and management, and that were related to developing an outpatient psychiatric program. In his findings and recommendations filed on March 12, 1992, the mediator concluded that 12 additional positions were necessary.
 
 
 9
 The defendants objected on the ground that the mediator had not used the constitutional standard of whether inmates were exposed to an unreasonable risk of harm to measure "adequate custodial staffing." Instead, the mediator interpreted the consent decree, according to its plain meaning, as establishing a standard based on whether staffing was adequate from a correctional perspective.
 
 
 10
 The magistrate judge recommended adoption of the mediator's recommendation. The defendants again objected, but the district court adopted the magistrate judge's recommendation, with some modifications, on December 9, 1992. The district court held that "adequate custodial staffing," as used in the consent decree, was not ambiguous and when construed according to its ordinary meaning, did not implicate the constitutional standard.
 
 
 11
 The defendants argue that the consent decree's reference to "adequate supervision" was ambiguous and should be interpreted according to the mutual intentions of the parties at the time the consent decree was entered.
 
 The consent decree stated:
 
 12
 Defendants shall review the staffing levels of each unit at CMF to determine whether there are adequate custody staff to properly supervise and to provide escorts and other services to inmates in those units. Defendants shall submit a report of their conclusions and any recommendations to the Mediator and plaintiffs' counsel.
 
 
 13
 The primary issue is whether "adequate custodial staffing to properly supervise" means only that staff sufficient to protect inmates from an unreasonable risk of violence, which is the constitutional minimum standard. See Hudson v. Palmer, 468 U.S. 517, 526-27, 104 S.Ct. 3194, 3200-01, 82 L.Ed.2d 393 (1984). The plaintiffs contend that the district court and the mediator properly applied the higher standard of accepted correctional practices.
 
 
 14
 Interpretation of a consent decree is a question of law that we review de novo. Thompson v. Enomoto, 915 F.2d 1383, 1388 (9th Cir.1990), cert. denied, --- U.S. ----, 112 S.Ct. 965, 117 L.Ed.2d 131 (1992). The rules of contract interpretation of the situs state govern interpretation of the consent decree. Id. The language of the contract governs if it is clear and explicit. Id. Cal.Civil Code Sec. 1638. Words in a contract are generally understood in their ordinary and popular sense, and technical words are interpreted as usually understood by persons in the profession or business to which they relate. Cal.Civil Code Sec. 1644.
 
 
 15
 The plain meaning of the terms of the consent decree is clear: the staff must be adequate "to properly supervise prisoners and to provide escorts and other services." The consent decree does not state that the staff must only protect inmates from an unreasonable risk of violence. We must interpret the contract "to give effect to the mutual intention of the parties as it existed at the time of contracting," Thompson, 915 F.2d at 1388 (citing Cal.Civil Code Sec. 1636), but we determine that by referring to the language of the agreement, if possible. Cal.Civil Code Secs. 1638, 1639. Where the parties negotiated use of a constitutional standard, they specified so in the language of the consent decree. Otherwise, the consent decree is not limited to constitutional standards. In fact, it states that "[t]he parties agree that it is not the intent of [the] Consent Decree to prescribe the minimum standards required by the United States Constitution."
 
 
 16
 The language of the consent decree is not ambiguous. Even if it were, the objectively determinable mutual intention of the parties at the time the parties agreed to the consent decree does not indicate any alternative meaning. The consent decree did not mention the constitutional standard. "[T]he true intent of a party is irrelevant if it is unexpressed." United Commercial Ins. Serv., Inc. v. Paymaster Corp., 962 F.2d 853, 856 (9th Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 660, 121 L.Ed.2d 585 (1992).
 
 
 17
 Furthermore, the district court's construction of the "adequate supervision" phrase is consistent with other provisions of the consent decree. The consent decree specifically provides that the parties waive "any determination whether the remedies provided are legally required." The remedies provided by the consent decree are not to be considered "legally required." The defendants argue that the district court should have limited the staffing to the constitutional minimum because the district court applied a statutory standard when it evaluated a separate claim that arose from the consent decree concerning the treatment of HIV-positive inmates. This claim is without merit. The Constitution and relevant applicable statutes, such as the Rehabilitation Act, establish floors below which the prison officials may not go legally. They are, however, free to negotiate to do more than those laws require, which is what resulted in the custodial staffing provision of the consent decree.
 
 
 18
 We affirm the judgment of the district court in No. 93-15363.
 
 III.
 NO. 93-16136: HIV-POSITIVE INMATES
 
 19
 The HIV-positive inmates challenged the prison policy of segregating HIV-positive inmates from other inmates and denying them access to jobs and programs open to other inmates. The consent decree provided that the defendants would develop a pilot program to determine the feasibility of placing HIV-seropositive inmates in a general population program at CMF. The stated goal of the pilot program was "to demonstrate that such placement is possible consistent with medical, behavioral, and security considerations."
 
 
 20
 The defendants submitted their report to the mediator. The parties mediated three issues in hearings conducted by the mediator. Issues concerning the defendants' policy regarding the HIV-positive inmates in the CMF population were all agreed to, with the exception of one issue. That single issue was the defendants' policy of excluding HIV-positive inmates from preparing or serving food at CMF. The defendants enforced a blanket policy excluding all HIV-positive inmates from food service programs. After an unsuccessful attempt at negotiations, a formal evidentiary hearing was held before the mediator. The mediator recommended that the court enjoin the defendants from denying food service employment to those inmates, absent a written determination that an individual inmate is not otherwise qualified to perform the job and that the defendants cannot reasonably accommodate the inmate so that he will be able to perform the essential functions of the job.
 
 
 21
 The defendants objected, but the magistrate judge recommended that the district court adopt the mediator's findings and recommendations. The district court adopted the magistrate judge's findings and recommendations and held that the policy of exclusion violated section 504 of the Rehabilitation Act. The district court's order stated in part:
 
 
 22
 2. The following policy which has been agreed to by the parties is approved:
 
 
 23
 "Placement in a closed HIV positive unit can only be ordered by a Unit or Institution Classification Committee, and only if one of the following criteria is met:
 
 
 24
 A. A documented history within the last twelve (12) months of the following high risk behavior will normally exclude an HIV positive inmate from an open housing unit:
 
 
 25
 1. Participation in anal or oral intercourse; or
 
 
 26
 2. Assault during which the HIV positive inmate bleeds and inflicts an open wound on another.
 
 
 27
 B. An HIV positive inmate may be excluded from open housing if:
 
 
 28
 1. There is reasonable cause to believe that the inmate is likely to engage in anal or oral intercourse; or
 
 
 29
 2. There is reasonable cause to believe that the inmate is likely to engage in assaultive behavior which is intended or likely to inflict an open wound on another.
 
 
 30
 In either case, the fact of the case and the grounds and reasoning for the reasonable cause decision must be documented in a classification form 128-G."
 
 
 31
 3. Defendants are enjoined from denying food service employment to all HIV positive inmates at California Medical Facility absent a written determination that an individual inmate is not otherwise qualified to perform the job in that he cannot perform the essential functions of the job, and that defendants cannot reasonably accommodate the inmate such that he will be able to perform those functions....
 
 A. Discussion
 
 32
 In agreeing to the provisions of the consent decree, the parties recognized that rights established by section 504 of the Rehabilitation Act of 1973 were implicated. Section 504, as amended and codified at 29 U.S.C. Sec. 794(a) ("the Act"), provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance."[1] Thus, the Act requires that the plaintiff (1) have a disability, (2) be otherwise qualified for the job, and (3) be excluded due to discrimination solely by reason of his or her disability. In addition, the program doing the discriminating must receive federal assistance.
 
 
 33
 The term "individual with a disability" is defined in section 706(8)(B) of the Act to be "any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." 29 U.S.C. Sec. 706(8)(B).
 
 
 34
 In School Board of Nassau County v. Arline, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), the Supreme Court held that the Act applied to a teacher with tuberculosis who had been removed from a teaching position to an administrative position because of the perceived threat her condition posed to the health of others. The Court stated that the contagious effects of a disease could not be meaningfully distinguished from the disease's physical effect on the claimant. "It would be unfair to allow an employer to seize upon the distinction between the effects of a disease on others and the effects of a disease on a patient and use that distinction to justify discriminatory treatment." Id. at 282, 107 S.Ct. at 1128. Thus, the Court held that the essential inquiry was whether she was otherwise qualified for the job. Id. at 287, 107 S.Ct. at 1130. The Court stated:
 
 
 35
 In the context of the employment of a person handicapped with a contagious disease, we agree with amicus American Medical Association that this inquiry should include
 
 
 36
 "[findings of] facts, based on reasonable medical judgments given the state of medical knowledge, about (a) the nature of the risk (how the disease is transmitted), (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm."
 
 
 37
 In making these findings, courts normally should defer to the reasonable medical judgments of public health officials. The next step in the "otherwise-qualified" inquiry is for the court to evaluate, in light of these medical findings, whether the employer could reasonably accommodate the employee under the established standards for that inquiry.
 
 
 38
 Id. at 287-88, 107 S.Ct. at 1131 (citation and footnote omitted).
 
 
 39
 Following the Arline decision, we held in Chalk v. United States District Court, 840 F.2d 701 (9th Cir.1988), that the Act applied to a teacher who was diagnosed with AIDS. We noted that:
 
 
 40
 AIDS is caused by infection of the individual with HIV, a retrovirus that penetrates the chromosomes of certain human cells that combat infection throughout the body. Individuals who become infected with HIV may remain without symptoms for an extended period of time.
 
 
 41
 Id. at 706. In this case, as in Chalk, the physical impairment to the individual is not the issue, but rather the issue is the contagious effect of the HIV virus. Thus, there is no distinction to be drawn, for purposes of the Act, between those persons in whom the HIV virus has developed into AIDS and those persons who have remained asymptomatic. It is the possible transmission of the virus to others that is the basis of the individual's disability under the provisions of the Act. The Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. Sec. 12101(2), defines disability in terms identical to those of the Act in section 706(8)(B). The regulations implementing the ADA include, as a physical or medical impairment, "HIV disease (whether symptomatic or asymptomatic)." 28 C.F.R. Sec. 35.104(4)(l)(ii). This is consistent with the holdings of Arline and Chalk. Thus, we hold that a person infected with the HIV virus is an individual with a disability within the meaning of the Act. The Eleventh Circuit has reached a similar conclusion. See Harris v. Thigpen, 941 F.2d 1495, 1522-24 (11th Cir.1991).
 
 
 42
 We have held that the Act is applicable to prisons receiving federal financial assistance. Bonner v. Lewis, 857 F.2d 559, 562 (9th Cir.1988). It is undisputed that the prison facilities involved here received federal financial assistance. The defendants do not contest the fact that the policy restricts HIV prisoners who are otherwise qualified from participating in the food service program solely because they are infected with the HIV virus.
 
 
 43
 The issue is how the Act is to be applied in a prison setting. It is clear that HIV-seropositive prisoners have certain statutory rights; but, just as constitutional rights of prisoners must be considered in light of the reasonable requirements of effective prison administration, so must statutory rights applicable to the nation's general population be considered in light of effective prison administration. The Act was not designed to deal specifically with the prison environment; it was intended for general societal application. There is no indication that Congress intended the Act to apply to prison facilities irrespective of the considerations of the reasonable requirements of effective prison administration. It is highly doubtful that Congress intended a more stringent application of the prisoners' statutory rights created by the Act than it would the prisoners' constitutional rights. Thus, we deem the applicable standard for the review of the Act's statutory rights in a prison setting to be equivalent to the review of constitutional rights in a prison setting, as outlined by the Supreme Court in Turner v. Safley, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). The Court stated:
 
 
 44
 [W]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests.
 
 
 45
 Id. at 89, 107 S.Ct. at 2261. This is equally applicable to the statutory rights created by the Act. In applying Turner to a prison regulation in an Arizona prison system, we synthesized the factors relevant to the determination of reasonableness as set forth in Turner.
 
 
 46
 Turner identifies four factors relevant in determining the reasonableness of prison policies: (1) whether there is a valid, rational connection between the prison policy and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right; (3) the impact that accommodation of the constitutional right will have on guards, on other inmates, or on the allocation of prison resources; and (4) whether the regulation or policy is an "exaggerated response" to prison concerns. The burden is on the inmates to show that the challenged regulation is unreasonable under Turner.
 
 
 47
 Casey v. Lewis, 4 F.3d 1516, 1520 (9th Cir.1993) (citations omitted).
 
 
 48
 The defendants admit that the medical risk of HIV prisoners infecting others through service of food, though theoretically possible, is slight. They do not justify the policy on medical considerations of the likelihood of transmitting the virus through food service. Rather, the justification is based on custodial security concerns that arise because of the inmates' perception of how the virus may be transmitted. The plaintiffs produced medical testimony that the HIV virus is transmitted by bodily fluids entering the body of another. The infected fluids include blood, semen, vaginal secretions, saliva, tears, and possibly sweat, although the latter three have lower concentrations of the virus. The fluids can enter the body through sexual contact, through open sores in the skin or mouth, or through mucous membranes in the eyes, nose, or mouth. There are cases where people have been infected by the virus entering the body through the mouth, most notably by oral sex. There is, of course, the well-publicized case where several patients apparently were infected orally by their treating dentist.
 
 
 49
 Although the risks of a prisoner acquiring HIV through food service are slight, even the plaintiffs' witnesses conceded the theoretic possibilities. The prison authorities, testifying for the defendants, noted the perception problems in the methods of transmission of a mysterious virus about which much is, as yet, unknown. Even public health officials advise precautions in situations where the risks are slight or unknown. The prison authorities also noted the particular sensitivity of prisoners to food service, which has often been the source of violence or riots. The prisoners have no choice of where to eat. The prison authorities testified that if HIV-seropositive inmates are placed in food service jobs, the other inmates will perceive a threat regardless of scientific research or medical pronouncements. When the transmission is by bodily fluids, such perceptions are particularly likely. Inmates fear that other inmates may do things to food that might be objectionable. If HIV-seropositive inmates are placed in food service jobs, the other inmates will think the worst--that they will bleed into the food, spit into the food, or even worse. If the inmate population perceives a risk from the food they must eat, they will want the infected inmates removed from the food service jobs. If they have no assurance that the infected inmates are removed, there may be violent actions against the inmates with the virus, inmates they perceive to have the virus, or the staff that permits the perceived risk.
 
 
 50
 The plaintiffs respond that proper education concerning the transmission of the HIV virus will remove the perceived risk. The prison authorities point out that many members of the general prison population are not necessarily motivated by rational thought and frequently have irrational suspicions or phobias that education will not modify. This is particularly true in light of the unknown aspects of the disease. Persons with such fears or phobias in society can choose to eat elsewhere--prisoners cannot.
 
 
 51
 The agreed compromise struck by the plaintiffs and the defendants with regard to the HIV-seropositive inmates affords those inmates reasonable opportunities in the general prison population. The HIV-seropositive inmates are screened for placement in the general housing of the prison population and are afforded the full programming opportunities available to the general population, except they are not given food service assignments. Prison authorities have provided a reasonable basis for this restriction based on legitimate penological concerns.
 
 The Supreme Court in Turner noted that:
 
 52
 Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint. Where a state penal system is involved, federal courts have, as we indicated in Martinez, additional reason to accord deference to the appropriate prison authorities.
 
 
 53
 Turner, 482 U.S. at 84-85, 107 S.Ct. at 2259 (citing Procunier v. Martinez, 416 U.S. 396, 405, 94 S.Ct. 1800, 1807, 40 L.Ed.2d 224 (1974)). Under the standard of review announced in Turner, deference is due to the prison authorities' policy not to open food service jobs to HIV-infected inmates. We reverse that portion of the district court's order, which requires the defendants to allow HIV-infected inmates the opportunity to work in food service jobs.
 
 IV.
 ATTORNEYS' FEES: NOS. 91-16702 and 91-16780
 
 54
 The issues concerning attorneys' fees relate to attorneys' fees and costs awarded to the plaintiffs for two specific activities: (1) the preparing and the litigating of the application for attorneys' fees and costs for work done prior to the entry of the consent decree, and (2) the attorneys' fees and costs incurred in monitoring the compliance phase of the case following the entry of the consent decree. The arguments in the appeal of the defendants and the cross-appeal of the plaintiffs relate to the award for both activities. The original order of the district court awarding fees for both activities was entered on July 29, 1991. An order amending that order was entered on September 30, 1991. The appeal and cross-appeal concern the original order as amended.
 
 A. Fees for Work on the Fee Application
 
 55
 Following the entry of the consent decree, the plaintiffs made an application for attorneys' fees and an award was made by the district court. That award was appealed, and we entered a judgment reversing that award in part and remanding for further proceedings in the district court. See Gates v. Deukmejian, 987 F.2d 1392 (9th Cir.1993). The issues raised in that remand are not before us on this appeal. The issue on this phase of the appeal relates only to the plaintiffs' award of attorneys' fees for preparing and litigating the fee application. However, the opinion in that case provides guidance in resolving some of the issues involved in this appeal.
 
 
 56
 "We review the district court's determination regarding the proper amount of the attorneys' fees award under Sec. 1988 for an abuse of discretion." Id. The plaintiffs sought fees and costs in the amount of $220,904. The district court awarded $177,603. The defendants seek a reduction in the award; the plaintiffs in the cross-appeal seek an increase.
 
 
 57
 The defendants raise two objections. First, they contend that the district court did not adequately review the hours expended and the costs presented by the plaintiffs. Second, they contend that because the firm of Rosen, Bein & Asaro is the lead law firm handling the application for attorneys' fees, the other law firms should not be compensated for their work on the fees litigation.
 
 We held in Gates that:
 
 58
 The fee applicant bears the burden of documenting the appropriate hours expended in the litigation and must submit evidence in support of those hours worked. The party opposing the fee application has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits.
 
 
 59
 Id. at 1397-98 (citations omitted). The plaintiffs' counsel submitted documentation of the hours expended and evidence in support of those hours. The district court's order reflects that the court carefully considered the plaintiffs' declarations and billing statements. The defendants failed to meet their burden of rebuttal by submitting evidence to challenge the assertions of the plaintiffs' counsel. The order of the court states "Defendants have failed to point with specificity to any fees sought by the plaintiffs which are 'duplicative.' " The defendants did not object to the calculation of hours expended in their motion to amend the original order.
 
 
 60
 On the issue of whether the time expended by law firms in addition to the Rosen law firm should be compensated, the test is whether the time expended was duplicative. See Davis v. City and County of San Francisco, 976 F.2d 1536, 1544 (9th Cir.1992), vacated in part, 984 F.2d 345 (9th Cir.1993). The plaintiffs contend that the time was necessarily spent, and the defendants have made no showing that the hours claimed are duplicative.
 
 
 61
 On cross-appeal, the plaintiffs contend that the district court erred when it applied the hourly fees for the Sacramento area, rather than the San Francisco area that was used to calculate the fees for the merits work. In Gates, we recognized that normally the relevant legal community for determining the prevailing market rates for attorneys' fees is the community in which the forum is situated. 987 F.2d at 1405. However, we concluded that the district court did not abuse its discretion in awarding fees at San Francisco rates for litigation leading to the consent decree. We stated:
 
 
 62
 Plaintiffs offered substantial evidence demonstrating that the issues in prisoner civil rights cases are extremely complex and thus require experienced and sophisticated counsel. They offered numerous declarations of San Francisco and Sacramento attorneys which directly support their contention that Sacramento attorneys and law firms with the requisite expertise and experience to handle this type of complex institutional prison reform litigation were unavailable.
 
 
 63
 Id. The district court determined, however, that it was not justified to apply San Francisco rates to litigating the amount of attorneys' fees. The justification of complex, specialized knowledge and experience did not apply. This is certainly a reasonable conclusion. The district court did not abuse its discretion in selecting the forum area of Sacramento in determining prevailing market rates.
 
 B. Fees and Costs for Monitoring Work
 
 64
 After the consent decree was entered, the district court entered an order establishing a procedure for periodic payment of attorneys' fees and costs during the pendency of the consent decree. The order allows the plaintiffs to submit quarterly statements of fees and costs. The defendants then have 30 days from the receipt of the quarterly statement to notify the plaintiffs of any disputed items and of the basis for the dispute. The parties then must meet and confer within 30 days of the defendants' notification. The plaintiffs may file a yearly motion to compel payment of disputed items, and under certain circumstances, the plaintiffs may bring a quarterly motion to compel.
 
 
 65
 The order also provides that on or before September 15 of each year during the life of the consent decree, the plaintiffs' counsel will provide the defendants with written notice of anticipated billing rates for the coming year and the effective date of the new rates. The defendants may make a motion to oppose the projected rates within 30 days of receipt of the plaintiffs' notice.
 
 
 66
 The order states that the standard of review to be applied to disputed billing items will be whether the services were reasonably performed during the pendency of the consent decree.
 
 
 67
 The plaintiffs' first quarterly statement of fees was presented on February 1, 1991, covering compliance and monitoring work performed and costs incurred from March 9 through September 30, 1990. The defendants agreed to most of the fees and costs requested by the plaintiffs' counsel, but disputed certain items. At the meet and confer session, the defendants' counsel objected to paying for the plaintiffs' counsel's travel time and to the San Francisco market rates sought by the plaintiffs for 1990 compliance work. The plaintiffs then moved to compel payment of travel time and of the San Francisco 1990 market rates. The defendants filed a motion opposing the plaintiffs' proposed rates for monitoring work to be performed in 1991.
 
 1. Justiciability
 
 68
 The plaintiffs contend in their cross-appeal that the order awarding fees for monitoring the compliance with the consent decree are unripe for review because the orders are interim orders, and the compliance work is ongoing. They urge the court not to allow any appeal until the conclusion of the periodic fees process after the final conclusion of the monitoring period.
 
 
 69
 Title 28 U.S.C. Sec. 1291 confers jurisdiction of appeals on the courts of appeals over all final decisions of the district courts. Interim attorneys' fees awards made under section 1988 prior to entry of a final judgment on the merits are not appealable under section 1291. See Rosenfeld v. United States, 859 F.2d 717, 720 (9th Cir.1988); Hillery v. Rushen, 702 F.2d 848 (9th Cir.1983).
 
 
 70
 Although the fees orders in this case came after entry of the consent decree, which is a final judgment on the merits, the appellants argue that they are analogous to interim fees orders because they arose in an ongoing, regular periodic fees process. In Rosenfeld, we considered the finality of interim fee awards under the Freedom of Information Act. We concluded that an interim fees award was not final when it did not come after a final judgment on the merits, it did not dispose of the underlying litigation, and it did not dispose of the issue of attorneys' fees because the district court explicitly provided for revision of the amount of the fees award at the conclusion of the litigation. Rosenfeld, 859 F.2d at 720.
 
 
 71
 The awards before us are different because they follow a final judgment on the merits, and they do dispose of the issue of attorneys' fees for monitoring work performed during the first period of the consent decree. See, e.g., Haitian Refugee Center v. Messe, 791 F.2d 1489, 1494 (award finally disposing of issue of fees for litigating the case up to certain point was appealable), vacated in part, 804 F.2d 1573 (11th Cir.1986).
 
 
 72
 The facts weigh in favor of review now. Legal issues determined at this stage will smooth the process for future awards. The fees orders are final, and the defendants must pay the plaintiffs' counsel. The compliance period has not been limited to a definite time frame, thus review could be postponed for many years, if not granted now. The defendants suggest that the periodic motions before the district court could be grouped annually for possible appeals. We encourage the district court to group the motions in some such manner. However, we hold that the claim presently before us is reviewable.
 
 2. Defendants' Objections
 
 73
 a. The defendants contend that the district court did not adequately review the billings for hours and costs for the monitoring work. As previously discussed in connection with the other attorneys' fees award, the plaintiffs produced adequate support, the district court reviewed it, and the defendants failed to make adequate specific objections.
 
 
 74
 b. The defendants contend that the special expertise justifying the San Francisco rates for the litigation leading to the consent decree was not necessary for the monitoring phase of this case.
 
 
 75
 The district court considered the issue in some detail, and concluded that the plaintiffs established that "the same expertise that support application of San Francisco rates for the merits portion of this case" justified using San Francisco as the relevant legal market for the compliance and monitoring phase. The court noted that counsel for the defendants had conceded that the plaintiffs' counsel's expertise on HIV issues was as essential to compliance and monitoring as it was to the merits phase. We conclude that this determination was not an abuse of discretion.
 
 3. Plaintiffs' Objections
 
 76
 The plaintiffs-cross-appellants requested increased rates for 1991, but the district court rejected those rates as unreasonable. Again, the plaintiffs on cross-appeal argue that the district court applied the wrong legal standard when it found the rates unreasonable because the plaintiffs had provided no evidence concerning retainer and other long-term billing arrangements, which would be more analogous to the relationship between a client and an attorney.
 
 
 77
 The district court's suggestion that a long-term billing arrangement containing lower rates would be a more appropriate standard for the plaintiffs' attorneys' fees was neither inappropriate nor the only basis for the court's decision. The court criticized the plaintiffs' evidence for relying on specific data from only one law firm and general assertions of reasonableness by several lawyers. The court observed that counsel were seeking an increase at the "high end of the legal market." As the defendants argued in opposing the plaintiffs' motion, the rate increases proposed by the plaintiffs' counsel exceeded the rate of inflation and exceeded the rate of increase of other Bay area law firms' fees. The court stated, "what is missing from this case is some reflection on recent developments in the practice of setting fees in the open market ... if plaintiffs were private paying clients, one might well expect a negotiated 'litigation budget,' or some other arrangement to control costs due to the length of the litigation." The district court's determination of the appropriate billing rate was not an abuse of discretion.
 
 V.
 CONCLUSION
 
 78
 The order of the district court concerning the merits of the case is affirmed with the exception of the portion of the order requiring the defendants to permit the HIV-infected inmates to serve in the food program. That portion is reversed. The district court's award of attorneys' fees is affirmed.
 
 
 79
 AFFIRMED in part, and REVERSED in part.
 
 
 
 [1]
 The 1992 amendment substituted the word "disability" for the word "Handicap," which was used in section 504 of the Rehabilitation Act of 1973