Sherry **BULLOCK** and Grady **Bullock, Plaintiffs,**

v.

James **GOMEZ, Director of the California Department of Corrections and William Duncan, Acting Warden of California Men's Colony, Defendants.**

No. CV 95–6634 LGB (RMCx).

United States District Court,
C.D. California.

May 6, 1996.

Donald Specter, Alison Hardy, San Quentin, CA, Taylor Flynn, ACLU Foundation of So. Calif., Los Angeles, CA, for Sherry Bullock, and Grady Bullock.

Daniel E. Lungren, George Williamson, Darrell Lee Lepkowsky, Timothy C. Foote, Cal. Asst. Attys. Gen., San Diego, CA, for James Gomez, William Duncan.

## ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BAIRD, District Judge.

### I. INTRODUCTION

Defendants' motion for summary judgment came on regularly for hearing on May 6,

1996. Having carefully considered the papers submitted and oral argument of counsel, the Court hereby DENIES defendants' motion for summary judgment.

## II. PROCEDURAL BACKGROUND

On October 4, 1995, plaintiffs Grady and Sherry Bullock filed the instant complaint alleging that Mr. Bullock has been denied the right to participate in the California Department of Corrections' ("CDC") family visiting program with his wife due to his medical condition in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12132, and Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794. Plaintiffs seek declaratory and injunctive relief under 28 U.S.C. §§ 1343, 2201, and 2202, 29 U.S.C. § 794(a), and 42 U.S.C. § 12117(a). The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

Currently before the Court is defendants' motion for summary judgment. Defendants base their motion on the grounds that: (1) plaintiffs have failed to state a cause of action pursuant to 42 U.S.C. § 1983 (Defs.' Conclusions of Law No. I); (2) neither the ADA nor the Rehabilitation Act apply to state correctional facilities (id. No. IV); and (3) if the ADA does apply, defendants have provided a reasonable accommodation (Mot. at 13).

The Court notes at the outset that the Complaint states a cause of action for declaratory and injunctive relief under the ADA and the Rehabilitation Act. Plaintiffs do not assert a claim under 42 U.S.C. § 1983. Furthermore, although defendants propose that the Court find plaintiffs are not entitled to compensatory or punitive damages, (id. at No. V), the Court notes that plaintiffs waived their right with prejudice to seek or accept an award of damages in this case. (Stipulated Waiver of Jury Trial filed Jan. 30, 1996.)

1. Defendants' (moving party) statement of uncontroverted facts is not supported by citations to admissible evidence. Such unsupported assertions of fact require that the Court search the record or defendants' points and authorities for supporting evidence. Plaintiffs' statement of genuine issues suffers from the same deficiency.

## III. FACTUAL BACKGROUND

Unless otherwise indicated, the following facts are uncontroverted:

Plaintiff Grady Bullock is incarcerated at California Men's Colony ("CMC"). Mr. Bullock has tested positive for the Human Immunodeficiency Virus ("HIV"), the virus that causes Acquired Immunodeficiency Syndrome ("AIDS").[1]

The CMC has a family visiting program that permits prisoners to visit with their immediate family members in relatively private conditions for an extended period of time, including overnight. (See 15 Cal.Code of Regs. § 3174 at Pl.'s Ex. 4.) Prisoners that are "identified HIV-infected inmates" are not permitted to have overnight family visits with their spouses. (CDC Admin. Bulletin 90/58, Defs.' Ex. 100.) Inmates with HIV are permitted to have overnight visits with their other family members, such as parents, adult children, or siblings. Id. The purpose of the policy is to prevent the spread of HIV to the spouse or to a child that might be conceived. (Defs.' Mot. at 3.) An inmate who is HIV positive and has an illness that is contagious may be excluded from overnight visits with other family members as determined by the attending physician. (CDC Admin. Bulletin 90/58 ¶ e(7), Defs.' Ex. 100.)

Mr. Bullock and his wife, Sherry Bullock, participated in the family visiting program prior to August 1994, when Mr. Bullock was diagnosed as HIV positive. Mrs. Bullock is also HIV positive. (Pl.'s Mot. at 2, Ex. 6.)[2] In addition, Mrs. Bullock is unable to conceive children due to a hysterectomy that she had in 1985. (Pl.'s Ex. 5.)

## IV. ANALYSIS

### A. Legal Standard

Summary judgment is appropriate if the evidence, read in the light most favorable to the nonmoving party, demonstrates that

2. Plaintiff cites to a medical progress report at Ex. 5, but the progress report is at Ex. 6. The report states that Mrs. Bullock is serology+, which the Court presumes is an equivalent notation for HIV+.

there is no genuine issue of material fact, and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ. P. 56(c); *Barnett v. Centoni,* 31 F.3d 813, 815 (9th Cir.1994).

To avoid summary judgment, the non-movant must set forth specific facts showing that there remains a genuine issue of material fact for trial. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A factual dispute is "genuine" if a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in the non-movant's favor. *Id.* at 255, 106 S.Ct. at 2514. If the nonmoving party's evidence is merely colorable or is not significantly probative, then summary judgment may be granted. *Id.* at 249–50, 106 S.Ct. at 2510–11.

### B. Discussion

#### 1. The ADA Applies to State Correctional Facilities

In language nearly identical to Section 504 of the Rehabilitation Act, Title II of the ADA provides in pertinent part:

> [N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132 (West 1995).

Defendants argue that the ADA does not apply to state prisons. (Defs.' Mot. at 10.) Defendants cite a qualified immunity case from the Fourth Circuit Court of Appeals in which the court concluded that, "although the ADA and the Rehabilitation Act were both in effect at the time of the alleged violations, it was not then clearly established that either statute applied to state prisons." *Torcasio v. Murray,* 57 F.3d 1340, 1352 (4th Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 772, 133 L.Ed.2d 724 (1996). The *Torcasio* court acknowledged that federal guidelines provide evidence that it is *now* established that the ADA applies to state prisons, *id.* at 1351, and

that the Ninth Circuit has squarely held that the Rehabilitation Act applies to prisons, *id.* at 1349.

■ Under the current law in the Ninth Circuit this Court is led to conclude that the ADA applies to state correctional facilities. *See Bonner v. Lewis,* 857 F.2d 559, 562 (9th Cir.1988) (holding that the Rehabilitation Act applies to state correctional facilities). The ADA has the same broad language as the Rehabilitation Act. The Ninth Circuit found that such language indicated Congressional intent to encompass prisons. *Id.; see also Collings v. Longview Fibre Co.,* 63 F.3d 828, 832 n. 3 (9th Cir.1995) ("The legislative history of the ADA indicates that Congress intended judicial interpretation of the Rehabilitation Act be incorporated by reference when interpreting the ADA.")

In addition, Congress explicitly provided the following guide for construction of the ADA: "Except as otherwise provided in this chapter, nothing in this chapter shall be construed to apply a lesser standard than the standards applied under title V of the Rehabilitation Act of 1973 (29 U.S.C. § 790 et seq.) or the regulations issued by Federal agencies pursuant to such title." 42 U.S.C. § 12201(a). Thus, the Ninth Circuit's holding that the Rehabilitation Act applies to prisons supports a finding that the ADA also applies.

Congress also delegated authority to the Department of Justice ("DOJ") to construe the ADA by regulation. 42 U.S.C. § 12134(a). "Because Congress explicitly delegated authority to construe the statute by regulation, in this case [the Court] must give the regulations legislative and hence controlling weight unless they are arbitrary, capricious, or plainly contrary to the statute." *United States v. Morton,* 467 U.S. 822, 834, 104 S.Ct. 2769, 2776, 81 L.Ed.2d 680 (1983). The DOJ regulations indicate that the ADA applies to state prisons. For example, 28 C.F.R. § 35.190(b)(6) provides that the DOJ is responsible for the implementation of the ADA's compliance procedures for components of State and local government programs and services that relate to law en-

forcement, "including courts and correctional institutions[.]"

Lastly, in response to correspondence from the Association of State Correctional Administrators, Deval L. Patrick, Assistant Attorney General, Civil Rights Division, states that the ADA prohibits discrimination against qualified individuals on the basis of disability by state and local governmental entities, including correctional institutions. (Letter from Deval L. Patrick to George M. Camp, (Apr. 11, 1995), provided at Pl.'s Opp. Ex. 10.)

Based on the foregoing, the Court concludes that the ADA applies to state correctional facilities.

### 2. Violation of the ADA

Title II of the ADA provides in pertinent part: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."

The regulations implementing the ADA include, as a physical or medical impairment, "HIV disease (whether symptomatic or asymptomatic)." 28 C.F.R. § 35.104(4)(*l*)(ii).

[T]itle II requires a public entity to make its programs accessible in all cases, except where to do so would result in a fundamental alteration in the nature of the program or in undue financial and administrative burdens.

28 C.F.R. Pt. 35, App. A at 466 (1995).

■ However, the Ninth Circuit rule is that when applied to prisoners, the statutory rights applicable to the nation's general population must be considered in light of effective prison administration. *Gates v. Rowland*, 39 F.3d 1439, 1446 (9th Cir.1994). The applicable standard for review of rights pursuant to the ADA in the prison setting is set

forth and applied below at part IV.B.4.b, the discussion of the Rehabilitation Act in a prison setting.[3]

### 3. The Rehabilitation Act Applies to State Correctional Facilities

Section 504 of the Rehabilitation Act provides in pertinent part:

"No otherwise qualified individual with handicaps ... shall, solely by reason of her or his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance...."

29 U.S.C. § 794(a) (West Supp.1995)

■ The Ninth Circuit has held that the Rehabilitation Act applies to state correctional facilities. *Bonner v. Lewis*, 857 F.2d 559, 562 (9th Cir.1988).

### 4. Violation of the Rehabilitation Act

■ In order to prove a violation of the Rehabilitation Act a plaintiff must show that he or she: (1) has a disability; (2) is otherwise qualified for the benefit; (3) was denied the benefit due to discrimination solely by reason of his or her disability; and (4) the *discriminating facility receives federal assistance. Id.* at 562–63.

■ In the case at bar, the first, third, and fourth elements are clearly satisfied. Mr. Bullock has a disability. "[A] person infected with the HIV virus is an individual with a disability within the meaning of the [Rehabilitation] Act." *Gates v. Rowland*, 39 F.3d 1439, 1446 (9th Cir.1994). Mr. Bullock has been denied overnight family visits due to his status as an inmate identified as HIV positive, and there is no dispute that the prison receives federal assistance. A question exists as to whether Mr. Bullock is otherwise qualified for overnight family visits.[4] How-

---

3. For purposes of this summary judgment motion, the Court has combined the analysis of the ADA and Rehabilitation Act claims. Mr. Bullock qualifies as an individual with a disability under both statutes. The remedies, procedures, and rights under Title II of the ADA are the same as under the Rehabilitation Act. *See* 42 U.S.C. § 12133. The Court's ruling in this case hinges on the determination of issues common to both

statutes. Any differences in the standards do not appear critical to the summary judgment determination.

4. Mr. Bullock had a reactive test for hepatitis C. However, this fact is not relevant to the analysis of the policy barring overnight visits for HIV positive inmates and their spouses. An additional policy allows for the denial of all overnight

ever, defendants do not dispute that the policy applies to prisoners who are otherwise qualified from participating in the overnight visitation program with their spouses solely because they are infected with the HIV virus. The issue that remains is whether an inmate with the HIV virus can be "otherwise qualified" within the meaning of section 504.

The United States Supreme Court addressed the issue of whether a person with a contagious disease could be otherwise qualified for employment in *School Board of Nassau County v. Arline*, 480 U.S. 273, 287, 107 S.Ct. 1123, 1130–31, 94 L.Ed.2d 307 (1986). The Court stated that "[t]o answer this question in most cases, the district court will need to conduct an individualized inquiry and make appropriate findings of fact. Such an inquiry is essential if § 504 is to achieve its goal of protecting handicapped individuals from deprivations based on prejudice, stereotypes, or unfounded fear, while giving appropriate weight to such legitimate concerns of grantees as avoiding exposing others to significant health and safety risks." *Id.* The Court further stated:

> In the context of the employment of a person handicapped with a contagious disease, we agree with *amicus* American Medical Association that this inquiry should include
>
> > "[findings of] facts, based on reasonable medical judgments given the state of medical knowledge, about (a) the nature of the risk (how the disease is transmitted) (b) the duration of the risk (how long is the carrier infectious), (c) the severity of the risk (what is the potential harm to third parties) and (d) the probabilities the disease will be transmitted and will cause varying degrees of harm."
>
> In making these findings, courts normally should defer to the reasonable medical judgments of public health officials. The next step in the "otherwise-qualified" inquiry is for the court to evaluate, in light of these medical findings, whether the employer could reasonably accommodate the

employee under the established standards for the inquiry.

*Id.* at 287–88, 107 S.Ct. at 1131 (citations omitted).

### a. Discussion of the *Arline* Factors: Is Mr. Bullock Otherwise Qualified?

■ "Transmission of HIV is known to occur in three ways: (1) through intimate sexual contact with an infected person; (2) through invasive exposure to contaminated blood or certain other bodily fluids; or (3) through perinatal exposure (i.e. from mother to infant)." *Chalk v. United States Dist. Court*, 840 F.2d 701, 706 (9th Cir.1988). There is no evidence of transmission of the AIDS virus by everyday contact. *Id.*

In the instant case, Mrs. Bullock is HIV positive and unable to conceive children. Thus, there is no risk of transmitting HIV to either the spouse or an unborn child. There is no medical evidence indicating that the next inmate and visitor to use the family visiting facility after the Bullocks would be at risk.

Thus, we focus on the concerns raised by Defendants that: (1) Mrs. Bullock because she is HIV positive, is susceptible to tuberculosis ("TB"), drug resistant TB, hepatitis, and other diseases which could be more easily transmitted during a conjugal visit. (Deposition of CDC Chief Medical Officer for Public Health Dr. Susann Steinberg dated Jan. 22, 1996, at 38:5–12 & 47:9; Defs.' Ex. 107, Excerpt from Surgeon General's Report at 20; Defs.' Ex. 108, Excerpt from TB Control Guidelines at 14; Defs.' Ex. 109, TB/HIV The Connection, Centers for Disease Control; Defs.' Ex. 111, Treatment of TB in Patients with Advanced HIV, 324 *New Eng. J. Med.* 289 Jan. 31, 1991.)

Defendants also cite to an incident where an HIV positive inmate transmitted TB to his HIV positive wife. However, the couple engaged in a regular visit, not an overnight visit. (Steinberg Dep. dated Feb. 9, 1996, at

visits for HIV positive inmates with other communicable diseases. *See* CDC Admin. Bulletin 90/58 ¶ 7.

Defendants assert in their Reply Brief that Mr. Bullock recently lost his eligibility for conjugal

visits. However, there is no indication that this is a permanent loss. Thus, Mr. Bullock's claim is not moot.

88–90.) Thus, the incident does not support defendants' position that overnight visits with a spouse should be barred.

(2) Individuals that are HIV positive and who contract TB can be more difficult to cure. (Defs.' Ex. 111, 324 *New Eng.J.Med.* 289.)

(3) Sexual contact between two individuals who are HIV positive can transmit more advanced strains of the virus. (Steinberg Dep. dated Feb. 9, 1996 at 120 states this is a theory; Steinberg Dep. dated Jan. 22, 1996 at 54 states that there is a potential for reinfection with a drug-resistant organism.)

Plaintiffs controvert these assertions with the testimony of Dr. Ronelle Campbell, Mr. Bullock's treating physician, and Dr. Peter Kerndt, Director of Los Angeles County's HIV Epidemiology Department. Both doctors conclude that Mr. Bullock's participation in the family overnight visiting program would not be detrimental to his health or to the health of his wife. (Campbell Dep. at 20–22, Pl.'s Ex. 7; Kerndt Expert Opinion No. 1, Defs.' Ex. 112.)[5] Dr. Kerndt further states that: "Denying all HIV+ prisoners conjugal visits is inconsistent with prevailing public health recommendations for married couples where both have HIV." (Kerndt Expert Opinion No. 2.); "Barring HIV+ prisoners from having conjugal visits with their spouses is not an effective measure to prevent the spread of tuberculosis." (*Id.* at No. 4.).

In addition, Dr. Steinberg testified that she believes that in some cases visiting should be curtailed. However, it is not only HIV infected individuals who are at risk, but others such as those with diabetes or chronic lung disease. Therefore, she believes that the determination should be made on a case by case basis. (Steinberg Dep. dated Jan. 22, 1996, at 38.)

Based on the foregoing, plaintiffs have succeeded in raising a genuine issue of fact as to whether Mr. Bullock is otherwise qualified to participate in the program. *See Crowder v. Kitagawa,* 81 F.3d 1480, 1485 (9th Cir.1996) ("[W]hen Congress has passed antidiscrimination laws such as the ADA which require reasonable modifications to public health and safety policies, it is incumbent upon the courts to insure that the mandate of federal law is achieved.")

The next step is whether CMC could reasonably accommodate the Bullocks. "Accommodation is not reasonable if it either imposes undue financial and administrative burdens on a grantee, or requires a fundamental alteration in the nature of the program." *Arline,* 480 U.S. at 287 n. 17, 107 S.Ct. at 1131 n. 17 (internal citations omitted). Defendants argue that it is not reasonable to require that a prison make medical determinations with respect to visitors. (Mot. at 19; no evidence cited.)

Plaintiffs assert first that under the ADA, defendants have the burden of proving the appropriateness of this defense. 28 C.F.R. § 35.150(a)(3). The decision that compliance would result in an undue burden must be made by the head of the public entity or his or her designee after considering all resources available for use in the funding and operation of the program. *Id.*

Plaintiffs counter defendants' assertion that it would be unduly burdensome to evaluate proposed visitors by pointing out that defendants already make individualized determinations regarding other contagious diseases,[6] and that the cost of verifying the medical condition of spouses of HIV positive inmates would be insignificant to the overall budget. (Opp. at 14; Dep. of James Gomez at 33:7–23.)

Based on the foregoing, the Court finds that plaintiffs have raised a genuine issue of

---

**5.** Plaintiffs cite to the Kerndt Dep. at 25–26, Pl.'s Ex. 14, but these pages do not support the assertion.

**6.** "To be considered for an overnight family visit, neither the inmate nor the visitor shall be known to have a history of recent or current intravenous drug use;" (Def.'s Mot. Ex. 100, ¶ 5); "[A]n overnight family visit may be denied [to an HIV+ inmate] if the attending physician determines that either the inmate or the visitor has a communicable disease which can be transmitted through casual contact ..." (*Id.* ¶ 7); Inmates with HIV can be "housed with an inmate who doesn't have HIV but who signs a waiver saying they know the other inmate is infected but still chooses to house with them." (Wiley Dep. at 22:21–25.)

fact as to whether an accommodation of the Bullocks would impose an undue financial or administrative burden on the program. *See Crowder*, 81 F.3d 1480, 1485 ("The Court's obligation under the ADA and accompanying regulations is to ensure that the decision reached by the state authority is appropriate under the law and in light of proposed alternatives.")

Thus, defendants' motion for summary judgment on the ground of public health concerns or that an accommodation would impose an undue burden is denied.

**b. Application of the Rehabilitation Act in a Prison Setting**

■ The analysis in the case at bar parallels that in *Gates* and raises the additional issue of how the Rehabilitation Act or the ADA is to be applied in a prison setting. "[J]ust as constitutional rights of prisoners must be considered in light of the reasonable requirements of effective prison administration, so must statutory rights applicable to the nation's general population be considered in light of effective prison administration." *Gates*, 39 F.3d at 1446. The Ninth Circuit deemed the applicable standard for the review of statutory rights in a prison setting to be equivalent to the review of constitutional rights in a prison setting, as outlined in *Turner v. Safley*, 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). *Id.* at 1447. The *Turner* standard deems a prison regulation valid "if it is reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89, 107 S.Ct. at 2261.

■ In applying *Turner* to a prison regulation in Arizona, the Ninth Circuit synthesized the factors relevant to the determination of reasonableness as set forth in *Turner*.

> *Turner* identifies four factors relevant in determining the reasonableness of prison policies: (1) whether there is a valid, rational connection between the prison policy and the legitimate governmental interest put forward to justify it; (2) whether there are alternative means of exercising the right; (3) the impact that accommodation of the constitutional right will have on guards, on other inmates, or on the allocation of prison resources; and (4) whether

the regulation or policy is an "exaggerated response" to prison concerns.

*Gates*, 39 F.3d at 1447 (citing *Casey v. Lewis*, 4 F.3d 1516, 1520 (9th Cir.1993)).

**i. Rational Connection to Legitimate Government Interest**

■ "Prison officials need merely put forward a legitimate government interest, and provide some evidence that the interest put forward is the actual reason for the regulation." *Casey*, 4 F.3d at 1520–21 (internal citations omitted). The burden is on the inmates to show that the challenged regulation is unreasonable under *Turner*. *Id.* at 1520.

■ In the instant case, plaintiffs argue that the prison administration has not expressed any legitimate security concerns. Both sides cite to the deposition testimony of CMC Warden William Duncan. (Mot. at 5 n. 13; Opp. at 20, Ex. 12.) When asked if the denial of family visits to prisoners who have HIV, with their spouses, was related to the security of the prison, Warden Duncan responded "yes." When asked how the issue would play out if prisoners with HIV were permitted to have overnight visits with their spouses, Warden Duncan responded, "It's not a significant security issue, but I think there are probably two that come to mind. One is if you have a spouse and an inmate, both of whom have HIV, that are involved in a family visit and engage in sexual intercourse, and the population became aware of that, they might be exposed to the disease by the subsequent family visitors." (Duncan Dep. at 24:7–25:3.)

Warden Duncan also testified that he is not aware of any incidents occurring when HIV positive prisoners were permitted to have family visits with family members other than their spouses, (Duncan Dep. at 25:18–22), where prisoners were unwilling to use a family visiting trailer after a prisoner known to have HIV had used it, (*id.* at 25:23–26:2), or where a prisoner had objected to assignment to a cell formerly occupied by an HIV positive prisoner, (*id.* at 26:22–27:2).

Both sides also cite to the testimony of former visiting Lieutenant Mike Wiley.

(Mot. at 5 n. 13; Opp. at 20, Ex. 13.) Again Wiley states theoretical concerns, and admits that he is unaware of any violent incidents occurring in other situations involving HIV positive inmates. (Wiley Dep. 21:14–23:15.) Lieutenant Wiley explains that allowing HIV positive inmates to have conjugal visits could create security risks because once inmates become concerned, even if the concerns have no validity, inmates "have different ways of dealing with their concerns than regular people. It comes to violence." (Wiley Dep. at 22:1–5.)

In *Gates,* the Ninth Circuit found that the prison policy denying HIV positive inmates food service jobs did not violate the Rehabilitation Act. 39 F.3d at 1448. The Ninth Circuit accepted the prison administration's justification for the policy based upon custodial security concerns that arose because of the inmates' perception of how the virus may be transmitted. *Id.* at 1447. Although the risks of a prisoner acquiring HIV through food service were recognized as being slight, it was theoretically possible. *Id.* However, the court discussed at length that prisoners, having no choice about where they eat, are particularly sensitive about food service. *Id.* Prison authorities testified that inmates feared that HIV positive inmates working in food service would contaminate their food by mixing blood or saliva into it. *Id.*

▉ The testimony in the instant case parallels that in *Gates,* where prison authorities were afraid that inmate concerns could lead to violence. 39 F.3d at 1447. Under Ninth Circuit authority testimony from the proper prison officials that certain material could lead to violence is a sufficient showing of a security threat. *Casey v. Lewis,* 4 F.3d at 1521. Proof that such materials have previously been the cause of violence is not required. *Id.*

Plaintiffs argue that the instant case differs significantly from *Gates.* The issue of the prisoners' sensitivity to their food service is not present here. The security concerns here are not nearly as plausible as those in *Gates.* (Opp. at 18–19.) Plaintiffs place much emphasis on Warden Duncan's statement that a change in the policy regarding overnight spousal visits is not a significant security issue. Too much emphasis on this statement would mischaracterize the testimony, but the Warden's statement certainly raises a question as to the actual basis for the policy. In addition, the testimony that there were no specific incidents regarding HIV positive inmates at CMC strongly suggests that the policy at issue is not based on the prison administration's concerns that other inmates will react irrationally to the use of overnight visiting areas by an HIV positive inmate and their HIV positive spouse.

Perhaps the most persuasive fact indicating that the policy is not based on security concerns is that HIV testing in the prison is not mandatory. (Campbell Dep. at 26.) Only one-third of the inmates estimated to be HIV positive are identified as such. (Steinberg Dep. dated Feb. 9, 1996, at 129.) Dr. Steinberg acknowledges that some prisoners with HIV are probably having conjugal visits, thereby facilitating transmission of HIV. (*Id.* at 128–29.) Dr. Campbell believes that one of the reasons that a significant number of HIV+ prisoners have not tested for HIV is that there are disincentives, the prohibition on conjugal visits being one such disincentive. (Campbell Dep. at 26; *see* Kerndt Expert Opinion ¶¶ 3(b)-(c) Defs.' Ex. 112.) Thus, it appears that it is general knowledge that unidentified HIV positive inmates use the overnight visiting areas for conjugal visits.

Based on the foregoing, the Court finds that plaintiffs have shown there is a genuine issue of fact as to whether the policy as applied to the Bullocks is rationally related to the penological interest of security.

### ii. Alternative Means of Exercising the Right

Defendants assert that permitting plaintiffs to participate in the regular visiting program is an "adequate accommodation" of their rights. Mrs. Bullock counters that because of limited financial means and her HIV-related fatigue, she has not been able to make the journey from her home to CMC since June, 1995. (Bullock Decl. ¶¶ 6–7, Pl.'s Ex. 15.) Because Mrs. Bullock does not own a car, she must use public transportation and stay in a motel for two nights in order to

# 1308

have one regular visit with her husband. (*Id.*) Most importantly, the public setting of the visiting room, where the Bullocks are not permitted to even hold hands, is far less private than the overnight visiting areas. (*Id.* at ¶¶ 10–11.) The lack of privacy in the regular visiting area makes it difficult for the Bullocks to discuss their terminal illness.

### iii. Impact on Others

The issue of inmate perception and the resulting risk of violence is discussed above. The potential impact on the prison administration is also discussed above. No other significant issues are raised by this factor.

### iv. Exaggerated Response to Prison Concerns

Defendants assert that due to the severity of the HIV virus, the denial of conjugal visits is not an exaggerated response. (Mot. at 16, lines 3–6.) Plaintiffs argue that HIV positive inmates should be allowed overnight visitation with spouses at least on a case-by-case basis. Plaintiffs point to the four other states that have family overnight visiting programs and the fact that each allows prisoners with HIV to participate either on a blanket basis or on a case-by-case basis. (Opp. at 1, Ex. 3.)

### v. Conclusion on *Turner* Factors

Under the standard of review announced in *Turner*, deference is due the prison authorities' policy not to permit HIV positive inmates overnight visits with their spouses. *Gates*, 39 F.3d at 1448. However, "satisfaction of the rational relationship factor is necessary, though not necessarily sufficient, to sustain a prison policy." *Casey*, 4 F.3d at 1523. Because the Court has found that plaintiffs raised a genuine issue of fact regarding the rational relationship factor, summary judgment is not appropriate in this case.

## V. CONCLUSION

The Court DENIES defendants' motion for summary judgment on the basis that plaintiffs have raised genuine issues of fact regarding the medical reasons for the visiting policy as applied to plaintiffs, the undue burden of accommodating plaintiffs, and the reasonableness under *Turner* of the prison administration's concerns about inmate violence.

IT IS SO ORDERED.