# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

U.S. EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,
        *Plaintiff-Appellant,*

        v.

UPS SUPPLY CHAIN SOLUTIONS,
        *Defendant-Appellee.*

No. 08-56874

D.C. No.
2:06-cv-06210-
ABC-E

OPINION

Appeal from the United States District Court
for the Central District of California
Audrey B. Collins, Chief District Judge, Presiding

Argued and Submitted
March 4, 2010—Pasadena, California

Filed August 27, 2010

Before: Alex Kozinski, Chief Judge, William A. Fletcher,
Circuit Judge, and John R. Tunheim, District Judge.*

Opinion by Judge Tunheim

*The Honorable John R. Tunheim, United States District Judge for the District of Minnesota, sitting by designation.

12891

## COUNSEL

Jennifer S. Goldstein (argued), EEOC, Washington, D.C., Anna Y. Park, EEOC, Los Angeles, California, for the appellant.

George W. Abele (argued), PAUL HASTINGS JANOVSKY & WALKER, LLP, Los Angeles, California, for the appellee.

## OPINION

TUNHEIM, District Judge:

The Equal Employment Opportunity Commission ("EEOC") filed suit under the Americans with Disabilities

Act ("ADA") alleging that UPS Supply Chain Solutions ("UPS") failed to provide reasonable accommodations for Mauricio Centeno's deafness because UPS did not provide him with a sign language interpreter for certain staff meetings, disciplinary sessions, and training. The district court granted summary judgment to UPS on all claims. The EEOC appeals the district court's decision. We find that there are genuine issues of material fact as to whether UPS unlawfully discriminated against Centeno by failing to make reasonable accommodations. We therefore reverse and remand.

## I. BACKGROUND

Mauricio Centeno has been deaf since birth and his first and primary language is American Sign Language ("ASL"). ASL is a visual, three-dimensional, non-linear language, and its grammar and syntax differ from the grammar and syntax of English and other spoken languages. *See Swenson v. Potter*, 271 F.3d 1184, 1199 (9th Cir. 2001) (W. Fletcher, J., dissenting); *Calloway v. Boro of Glassboro Dep't of Police*, 89 F. Supp. 2d 543, 547 n.9 (D.N.J. 2000). In many cases, there is no one-to-one correspondence between signs in ASL and words in the English language. *See King v. Bd. of Educ. of Allegany County*, 999 F. Supp. 750, 755 (D. Md. 1998) ("[E]very English word does not have a corresponding sign [in ASL], and every sign does not have a corresponding English word."). Centeno reads and writes in English at the fourth or fifth grade level. Centeno's supervisors were aware that Centeno was not able to read written English very well no later than 2002.

From 2001 until 2009, Centeno worked as a junior clerk in the accounts payable division of the accounting department at a UPS facility in Gardena, California. The parties do not dispute that Centeno was able to complete his job duties without the assistance of an ASL interpreter. The dispute centers on whether UPS provided Centeno with reasonable accommodations for certain benefits and privileges of employment that

did not affect his ability to complete his job duties. Those benefits include weekly meetings, job training, and understanding the company's sexual harassment policy.

## A.   Meetings

From 2002 until December 2007, the accounting department, which includes the accounts payable division and the accounts receivable division also, held weekly meetings. Beginning in May 2004, the accounts payable division held separate monthly meetings. Centeno's supervisors expected him to attend the weekly and monthly meetings.

Jenny Chan was Centeno's direct supervisor, and Gertraud Schulz was Chan's manager and supervisor. Schulz usually hosted the weekly departmental meetings, and Chan hosted them when Schulz was not available. The weekly meetings typically took more than thirty minutes, and some meetings took more than an hour. In advance of the meetings, Schulz sent out a written agenda, typically consisting of "three, four, five one line descriptions of topics" to be covered. Topics included changes to employee benefits, quarterly earnings, vacation and holiday scheduling, new human resources rules, safety regulations, time-reporting, a charitable fundraising drive, an employee opinion survey, the company's code of business conduct, computer virus scans, referral bonuses, and possible reorganizations and reductions in force. At these meetings, employees had the opportunity to make general announcements. Some meetings included group discussions.

Chan hosted the monthly meetings of the accounts payable division. Chan distributed an agenda at the beginning of each monthly meeting, and she presented information at these meetings.

The primary accommodation that UPS provided to Centeno at these meetings took the form of notes in the English language. When Chan presented at a meeting, she provided Cen-

teno with information by email and with typewritten notes that she created after the meeting. She based these notes on her memory of what was said in the meeting and on any handwritten notes she took during the meeting. During her presentations, however, Chan wrote down only the main point of what she was saying, and she did not always write down the questions and answers from the meeting.

Centeno testified that he "felt frustrated" with the system of Chan emailing him her notes after the meetings. When Chan emailed Centeno her meeting notes, sometimes Centeno went to her and wrote notes telling her that he did not understand what Chan had written. Centeno also "did not like getting the notes after the meeting because [he] did not get the information at the same time as everyone else in the accounting department. [He] did not get a chance to ask questions or give [his] ideas with everyone else."

Centeno "asked many times to have an ASL interpreter to sign for [him] at meetings." On August 5, 2002, Centeno wrote a letter to Chan and Schulz requesting an ASL interpreter for future meetings. He requested ASL interpreters for the meetings several more times in 2003, 2004, and 2005.

During Centeno's September 2004 performance evaluation, after UPS had denied Centeno's initial requests for an ASL interpreter, Centeno requested that UPS provide him with a contemporaneous record of the meetings. UPS implemented this accommodation in October 2004 by arranging for an employee to sit next to Centeno and write out notes of what was happening during the meeting so that Centeno could read them. One employee who was enlisted to take notes in Chan's place complained to Chan that it was "so much to write." Once this contemporaneous note-taking system was in place, Chan stopped regularly providing Centeno with written meeting summaries after the meetings. According to Centeno, this note-taking system "did not work very well. They could not write out everything. They would write just short little words

and keep telling me to wait. I could not really understand what was going on." Centeno sometimes fell asleep at monthly meetings when there was no interpreter. A 2003 document includes Chan's "notation to remind Mr. Centeno to stay awake at work." In March 2005, Centeno sent an email to an investigator from the EEOC saying, "I want interpreter with me for commcaite [sic] with them for discuss more than writing the note is so slow and waste time for them have wait listen from me." According to Chan, UPS's legal department told Ebonye Kaufman in human resources that UPS did not need to provide an interpreter for regular meetings that were less than two hours long, and Kaufman shared this information with Chan. According to Chan, Kaufman directed Chan to take notes at meetings and to email those notes to Centeno.

In 2005, UPS occasionally provided Centeno with an ASL interpreter for the monthly meetings, and starting in July 2006, UPS provided an interpreter for each monthly meeting. Kaufman testified that she strongly recommended to Schulz that UPS provide an ASL interpreter for departmental meetings. Schulz testified that "[i]t was [her] decision" to approve an interpreter for the monthly meetings but not for the weekly meetings.

An EEOC investigator instructed Centeno not to attend meetings where there would be no ASL interpreter. On April 25, 2005, Centeno emailed Chan and Schulz to inform them that he would not attend that week's meetings because there would be no interpreter. Someone from UPS's human resources department filled out a "Pittsburgh form" to create a formal record of Centeno's refusal to attend the meetings. In handwriting underneath this typewritten text is the word "insubordination." Chan, Schulz, and Centeno initialed the form. The form was included in Centeno's personnel file, and, according to Schulz, it was designed "to give him an opportunity to understand that he's expected to attend, in this case, a meeting."

Because Schulz told Centeno that he was required to attend the meetings that week, Centeno attended them. Centeno then reiterated that he was not going to attend any more meetings where there would not be an interpreter, and he stopped attending weekly meetings after April 2005. Schulz testified that even though she regarded the meetings as mandatory, she was told that if Centeno "doesn't come it's okay."

In July 2006, Centeno complained to Chan by email that she had not sent him the meeting summary until after he had left work.[1] As a result, Centeno had not been aware that two visitors would be coming through the facility the following day, and he had not had an opportunity to clean his work area or dress accordingly. Chan testified that she was frustrated by repeatedly getting these kinds of messages from Centeno.

In March 2007, Centeno had a meeting with human resources to discuss his need for an ASL interpreter at the weekly meetings. UPS provided an ASL interpreter for the human resources meeting. Centeno stated that he does not understand some written communications, and he requested that UPS provide an interpreter for all team meetings that last more than fifteen minutes. Centeno's supervisors would regularly tell him to use an English-language dictionary to look up words he did not understand. Centeno requested another meeting with Chan and human resources where an interpreter would be present. During that meeting, Centeno stated that "he does not understand or comprehend some written communication."

---

[1]UPS filed a motion to strike several of EEOC's citations to the excerpts of record, arguing that "[t]he EEOC improperly relies on facts that were ruled inadmissible by the trial court." But facts cannot be ruled inadmissible; only evidence can. And UPS conceded the undisputed nature of the facts the EEOC cites in its briefs. Contrary to UPS's disingenuous motion, the EEOC does not cite to any exhibits the district court excluded, but to UPS's own statement of undisputed facts. The EEOC properly relied on UPS's factual admissions.

**B.   Job Training**

In Centeno's 2001, 2002, and 2003 performance reviews, Centeno's supervisors identified a goal of improving Centeno's skills in using the Excel spreadsheet program. Schulz testified that supervisors "repeatedly" recommended that Centeno take Excel training. In April 2005, Chan reminded Centeno of this goal. Centeno replied that he had tried to use the on-line training program for Excel, but could not read it. In a performance review for the period from September 1, 2006, through August 31, 2007, UPS included the following notation in Centeno's development plan: "Excel knowledge—take a course (reminder again)." UPS set December 31, 2007, as the deadline for Centeno to complete the Excel course. In September 2007, UPS for the first time provided an ASL interpreter to assist Centeno with Excel training.

**C.   Discipline and the Anti-Harassment Policy**

On April 4, 2001, Centeno signed UPS's Professional Conduct and Anti-Harassment Policy. He testified that he did not understand the policy, but that "somebody said look that up in the dictionary, but [he] didn't understand the words. [He] didn't understand after that."

In late April 2005, Centeno had an incident with co-workers in the lunchroom. Some of his co-workers were banging on the table, and Centeno told them to stop. He became angry, "said an inappropriate word and made an inappropriate gesture," and left.

On May 9, 2005, Centeno had a meeting with Cheryl Nishimura, a supervisor in the human resources department, to discuss the incident. Nishimura provided an ASL interpreter "to be sure that Mr. Centeno understood [Nishimura] and [Nishimura] understood Mr. Centeno." Centeno apologized and acknowledged that he had used inappropriate language and an obscene gesture.

On May 11, 2005, in a meeting without an ASL interpreter, Chan and Nishimura gave Centeno a written warning about his behavior in the lunchroom. Nishimura's manager "said that it was appropriate to type out the explanation and that an interpreter didn't need to be present" for the meeting with Chan. The written warning stated that Centeno's "behavior and actions have been interpreted as inappropriate." It stated that "[i]mmediate, marked and sustained improvement of [Centeno's] conduct/behavior is required. Any repetition or continuation of the behavior noted above, or any other serious deficiency in your performance will result in further disciplinary action, which may include termination of your employment."

During the meeting on May 11, Centeno wrote a note indicating that he did not understand the written warning. Nishimura and Chan instructed Centeno to underline the words he did not understand. Among the words he underlined were "inappropriate," "forbidden," "conduct," and "termination." According to Nishimura, "[t]hen we wrote notes and brought a dictionary to explain the meaning of words [Centeno] did not understand."

Centeno signed a clean copy of the warning, "acknowledg-[ing] receipt of a copy of this Written Warning," but he testified that he did not understand the warning. He recalled that Chan or Nishimura told him to use a dictionary to look up the words that he did not understand, but he "didn't understand the words. [He] didn't understand after that." On May 16, 2005, Centeno indicated that he wanted to meet with human resources about the written warning because he did not understand it. Nishimura understood that Centeno "was trying to tell [her] that he didn't understand the written warning." Nishimura "was surprised because [she] felt that at the May 11th meeting [Centeno] had understood."

On May 19, 2005, Centeno met with Nishimura and Chan, with an ASL interpreter present, "to clarify any issues about

the discipline—specific to [Centeno's] understanding about the discipline." Centeno confirmed, through the interpreter, that he understood.

On September 6, 2005, Schulz emailed Centeno to let him know about a Harassment Awareness Quotient Questionnaire and UPS's Professional Conduct and Anti-Harassment Policy. Schulz instructed Centeno to complete the Questionnaire, and then to "sign off and date the 'Professional Conduct and Anti-Harassment Policy.' " Centeno underlined many words in the Anti-Harassment Policy that he could not understand, and he informed Chan that he did not understand them. He then gave Schulz the Policy with the underlined words, and Schulz understood that Centeno did not understand the underlined words. Centeno also circled eleven of the twenty true/false statements on the Questionnaire, indicating that he did not understand those prompts and could not determine whether they were true or false. Chan directed Centeno to use a dictionary to look up the words he did not understand in the Policy and on the Questionnaire. UPS did not provide Centeno with an interpreter to translate those documents.

## D.   Procedural Background

On September 28, 2006, the EEOC filed a complaint alleging that UPS engaged in unlawful employment practices on the basis of disability by failing to reasonably accommodate Centeno's deafness. On April 14, 2008, UPS filed a motion for summary judgment as to all claims.

The district court granted UPS's motion for summary judgment, concluding that UPS "undertook the interactive process with Centeno, and provided a variety of accommodations that effectively enabled Centeno to perform the functions of his job and that gave him access to the privileges and benefits of his employment." The court found that providing "note-writing, agendas, and summaries in connection with the weekly meetings discharged [UPS]'s duty under the ADA as

a matter of law." The court further found that "[t]here is no evidence that Centeno missed out on any significant privileges or benefits-related information due to [UPS]'s failure to provide him with an ASL interpreter for any meetings." With respect to the Anti-Harassment Policy, the court found that "[t]here is no evidence that these materials were 'training,' or that they related to Centeno's job functions or to the privileges or benefits of his employment." The Court found that there was no evidence that Centeno "tried to use the dictionary but it was ineffective."

The district court issued its final judgment on September 18, 2008, and the EEOC filed a timely notice of appeal on November 14, 2008.

## II.  Discussion

### A.  Standard of Review

"We review de novo the district court's grant of summary judgment. We view the evidence in a light most favorable to the non-moving party and decide whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law." *Fed. Trade Comm'n v. Stefanchik*, 559 F.3d 924, 927 (9th Cir. 2009) (citation and footnote omitted).

### B.  Analysis

The ADA prohibits discrimination "against a qualified individual on the basis of disability in regard to . . . job training[ ] and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The parties agree that Centeno is a qualified individual and that the focus of his claim is on the "privileges of [his] employment."

[1] "[T]he ADA says that 'discrimination' includes an employer's '*not making reasonable accommodations* to the

known physical or mental limitations of an otherwise qualified . . . employee, *unless* [the employer] can demonstrate that the accommodation would impose an *undue hardship* on the operation of [its] business.' " *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 396 (2002) (quoting 42 U.S.C. § 12112(b)(5)(A) (alterations and emphases in original)). UPS does not argue here, and did not argue before the district court, that Centeno's proposed accommodations would impose an undue hardship. The court's analysis therefore focuses on whether, in regard to the privileges of Centeno's employment, UPS provided reasonable accommodations to Centeno's known physical limitations. UPS's argument on appeal is that it reasonably accommodated Centeno because its modifications were effective.

**[2]** EEOC regulations define the term reasonable accommodation to include "[m]odifications or adjustments that enable a covered entity's employee with a disability to enjoy equal benefits and privileges of employment as are enjoyed by its other similarly situated employees without disabilities." 29 C.F.R. § 1630.2(o)(1)(iii). "An *ineffective* 'modification' or 'adjustment' will not *accommodate* a disabled individual's limitations." *Barnett*, 535 U.S. at 400. Ineffective modifications therefore are not accommodations. *Cf. Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1137 (9th Cir. 2001) ("An appropriate reasonable accommodation must be effective, in enabling the employee to perform the duties of the position." (internal quotation marks omitted)). "The reasonableness of an accommodation is ordinarily a question of fact." *Lujan v. Pac. Mar. Ass'n*, 165 F.3d 738, 743 (9th Cir. 1999).

**[3]** "[O]nce an employee requests an accommodation . . . , the employer must engage in an interactive process with the employee to determine the appropriate reasonable accommodation." *Zivkovic v. S. Cal. Edison Co.*, 302 F.3d 1080, 1089 (9th Cir. 2002). This interactive process "requires: (1) direct communication between the employer and employee to

explore in good faith the possible accommodations; (2) consideration of the employee's request; and (3) offering an accommodation that is reasonable and effective." *Id.* "An employer is not obligated to provide an employee the accommodation he requests or prefers, the employer need only provide some reasonable accommodation." *Id.* (internal quotation marks omitted). EEOC interpretive guidance states that "the employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide." Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. Part 1630, App., 56 Fed. Reg. 35,726-01, 35,749 (July 26, 1991).

**[4]** "[T]he duty to accommodate is a continuing duty that is not exhausted by one effort." *Humphrey*, 239 F.3d at 1138 (internal quotation marks omitted). "[T]he employer's obligation to engage in the interactive process . . . continues when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing and further accommodation is needed." *Id.* The continuing obligation to engage in the interactive process "fosters the framework of cooperative problem-solving contemplated by the ADA" because it "encourag[es] employers to seek to find accommodations that really work," and because it "avoid[s] the creation of a perverse incentive for employees to request the most drastic and burdensome accommodation possible out of fear that a lesser accommodation might be ineffective." *Id.*

## 1. Departmental Meetings

**[5]** UPS concedes that understanding and participating in mandatory departmental meetings are "benefits and privileges of employment," even when those meetings have no bearing on an employee's job performance. *See* 29 C.F.R. § 1630.2(o)(1)(iii). UPS further concedes that its obligation to make reasonable accommodations includes an obligation to

provide modifications that enable an employee "to enjoy equal benefits and privileges of employment" as other employees, including the benefits and privileges of understanding and participating in such meetings. *See id.* § 1630.2(o)(1)(ii)-(iii). UPS argues that there is no genuine dispute regarding whether the modifications of providing Centeno with agendas, contemporaneous notes, and written summaries for the weekly departmental meetings were effective.

**[6]** First, we conclude that there is a genuine issue of fact regarding whether the agendas, contemporaneous notes, and written summaries contained information sufficient to enable a person reading those documents to enjoy the same benefits and privileges of attending and participating in the weekly meetings as other employees. These meetings, which lasted up to one hour, had agendas that contained only cursory information about the topics to be covered. The contemporaneous notes also contained limited information. Centeno testified that when Chan took contemporaneous notes, she "wasn't writing what was going on in the meeting" and that her writing "was kind of limited." Centeno further explained in his affidavit that, regardless of who took notes, "[t]hey would write just short little words and keep telling me to wait. I could not really understand what was going on." Centeno also testified that during meetings he did not have an opportunity to express his questions because he did not have an ASL interpreter. Centeno also noted that when he received meeting summaries, he "did not get the information at the same time" as other members of the department and he did not have the opportunity to ask questions or share his ideas with the rest of the department. Chan testified that her summary notes were incomplete and did not always contain the questions and answers from the meetings. In summary, there is a genuine issue of material fact regarding whether these modifications, viewed as a whole, would allow a deaf employee, even one who was fluent in written English, to enjoy the benefits and privileges of attending and participating in the departmental

meetings. This is especially true in light of Centeno's limited proficiency in written English.

**[7]** Second, we conclude that there is an issue of fact regarding whether UPS was aware or should have been aware that the modifications were ineffective as to Centeno. As UPS notes, the ADA does not require an employer to be clairvoyant regarding the effectiveness of a modification. *See Conneen v. MBNA Am. Bank, N.A.*, 334 F.3d 318, 331 (3d Cir. 2003); *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 934 (7th Cir. 1995). But the employer has a continuing obligation to engage in the interactive process "when the employee asks for a different accommodation or where the employer is aware that the initial accommodation is failing." *Humphrey*, 239 F.3d at 1138. Viewing the facts in the light most favorable to Centeno, a reasonable trier of fact could conclude that Centeno asked for a different modification and that UPS was aware or should have been aware that the modifications it was offering were ineffective. *Cf. Daviton v. Columbia/HCA Healthcare Corp.*, 241 F.3d 1131, 1134 (9th Cir. 2001) (en banc) ("The Hospital staff knew or should have known that . . . a sign language interpreter was needed for effective communication between Hospital personnel and the Davitons.").

As an initial matter, UPS was aware of Centeno's limited proficiency in written English. Schulz testified that she was aware that Centeno had difficulty understanding written English. In a performance review dated August 5, 2001, Schulz recommended that Centeno "[t]ake an English writing class to improve his writing style." Centeno reminded his supervisors in writing, "I am not good writing I know I am bad level of English." Subsequent to the disciplinary action that UPS took in response to the May 2005 lunchroom incident, Chan and Nishimura should have been aware that Centeno was unable to understand many of the critical expressions contained in his written warning, even with the assistance of an English-language dictionary. A March 16, 2007 human resources "accommodation checklist" states that

one of Centeno's "current limitations" is that he "does not understand/comprehend some written communication."

Moreover, there is a genuine issue of fact regarding whether UPS was aware or should have been aware that the modifications for the weekly meetings, which relied on Centeno's capacity to understand written English, were ineffective. *See Zivkovic*, 302 F.3d at 1089; *Humphrey*, 239 F.3d at 1138. Centeno complained in writing that Chan's contemporaneous notes were "not enough for me" and that "ASL is better for me get more understand." Centeno testified that he told Chan that he did not understand her handwritten notes.[2] Centeno also testified that he told Chan that he did not understand some of the summaries Chan emailed to him. Centeno persisted in requesting an interpreter for the weekly meetings until he stopped attending. In March 2007, after Centeno continued to complain about UPS's failure to provide an interpreter for the weekly meetings, he met with Chan and a human resources representative and informed them that "he does not understand or comprehend some written communication." A reasonable trier of fact could conclude from this evidence that UPS knew or should have known that the agendas, contemporaneous notes, and meeting summaries were not effective modifications.

We further note that the trier of fact could conclude that UPS failed to explore possible accommodations in good faith. *See Zivkovic*, 302 F.3d at 1089. ADA regulatory guidance states:

> Although in some circumstances a notepad and written materials may be sufficient to permit effective communication, in other circumstances they may not be sufficient. For example, a qualified interpreter may be necessary when the information being com-

---

[2]Chan disputes this testimony, but this is a factual dispute not suitable for resolution on summary judgment.

municated is complex, or is exchanged for a lengthy period of time. Generally, factors to be considered in determining whether an interpreter is required include the context in which the communication is taking place, the number of people involved, and the importance of the communication.

*Duffy v. Riveland*, 98 F.3d 447, 456 (9th Cir. 1996) (quoting 28 C.F.R. Part 35, App. A). Evidence in the record suggests that in determining whether to provide an ASL interpreter for weekly meetings, UPS did not consider the nature of the information being communicated in a particular meeting or the length of the meeting, but instead relied on relatively arbitrary considerations. Schulz testified that she decided to approve an interpreter for the monthly meetings but not for the weekly meetings because she "felt once a month was sufficient." A trier of fact could conclude that UPS refused to provide an interpreter for regular meetings that were less than two hours long because there was a two-hour minimum charge for ASL interpreter services. If UPS failed to consider whether the circumstances of a weekly meeting necessitated the use of an ASL interpreter, then the trier of fact could find that UPS failed to engage in the interactive process in good faith.

**[8]** In summary, an employer has discretion to choose among effective modifications, and need not provide the employee with the accommodation he or she requests or prefers, but an employer cannot satisfy its obligations under the ADA by providing an ineffective modification. Where, as here, there is a disputed issue of fact regarding whether the modifications the employer selected were effective, and where the trier of fact could reasonably conclude that the employer was aware or should have been aware that those modifications were not effective, summary judgment is not appropriate.

## 2.  Job Training

**[9]** The ADA prohibits employers from discriminating against individuals "in regard to . . . job training." 42 U.S.C. § 12112(a). The record demonstrates that as early as April 2005, when Chan reminded Centeno of the goal of improving his skills by taking Excel training, Centeno informed Chan that he could not use the on-line training program because he could not read it. Yet Centeno's performance reviews continued to list "Excel knowledge" under Centeno's development plan. UPS waited for more than two years to provide Centeno with an ASL interpreter for Excel training.

**[10]** "The interactive process requires communication and good-faith exploration of possible accommodations between employers and individual employees, and *neither side can delay . . . the process*." *Humphrey*, 239 F.3d at 1137 (emphasis added). With respect to the Excel training, there is a genuine issue of material fact regarding whether UPS acted in good faith in the interactive process and whether UPS delayed providing Centeno with the accommodation he needed in order to receive the training.

## 3.  Anti-Harassment Policy

There is a genuine issue of material fact regarding whether UPS's modifications were effective in ensuring that Centeno understood the company's Anti-Harassment Policy.

During the May 11, 2005 disciplinary meeting with Chan and Nishimura, Centeno consulted an English-language dictionary in an effort to understand his written warning about the lunchroom incident. Soon after this meeting, Centeno notified Chan, Schulz, and Nishimura in writing that he did not understand the warning. When Nishimura received this notification, she was surprised because she had mistakenly concluded that the modifications she and Chan provided in the May 11 meeting had been effective. In response to Cen-

teno's notification, UPS set up a meeting with an ASL interpreter present to clarify Centeno's "understanding about the discipline."

Four months later, when Centeno reviewed the Anti-Harassment Policy and Questionnaire, he informed Schulz and Chan that he did not understand many of the words in the Policy and more than half of the questions in the Questionnaire. Schulz knew that Centeno did not understand the words he had underlined. In response, Chan did not provide an interpreter, but instead directed Centeno to use an English-language dictionary to look up the words he did not understand. UPS argues that Centeno must have been aware of his rights under the Policy because, in compliance with the Policy, he reported the lunchroom incident to human resources. This fact is not sufficient to show that Centeno understood the Policy.

[11] Viewing this evidence in the light most favorable to Centeno, a reasonable trier of fact could conclude that as of September 2005, UPS was aware or should have been aware that Centeno needed an ASL interpreter to understand the Anti-Harassment Policy. Even if Centeno did not expressly request an interpreter to understand the Policy, a reasonable trier of fact could conclude that UPS was aware or should have been aware that the modification it offered—consulting an English-language dictionary—was not effective. *See Zivkovic*, 302 F.3d at 1089; *Humphrey*, 239 F.3d at 1138.

Therefore summary judgment is not appropriate.

## Conclusion

[12] Because the EEOC has raised triable issues of fact as to whether UPS provided Centeno with reasonable accommodations and as to whether UPS knew or should have known that its modifications were ineffective, we reverse the district

court's summary judgment and remand for further proceedings.

We deny UPS's motion to strike, *see Kirshner v. Uniden Corp. of Am.*, 842 F.2d 1074, 1077 (9th Cir. 1988); Fed. R. App. P. 10(a), and we decline to address the issue of punitive damages, *see Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1293 (9th Cir. 2006) (en banc).

**REVERSED and REMANDED** for further proceedings consistent with this opinion. Costs to Appellant EEOC.